UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN LEE CHURCH,

       Petitioner,

                                    Case No. 1:02-CV-231

v.

                                    Hon. David W. McKeague

TERRY PITCHER,

       Respondent.

_____/

## REPORT AND RECOMMENDATION

       Petitioner, a prisoner currently incarcerated at a Michigan correctional facility, has filed a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254.

### Background

       Petitioner was charged with the murder of a six month old child in what the trial court referred to as a "shaken baby case." Trial Trans. I at 36-37. On April 9, 1997, a jury convicted petitioner of second-degree murder, MCL § 750.317. He was sentenced to 10 to 30 years' imprisonment. After the trial court denied petitioner's motion for a new trial, he appealed the conviction to the Michigan Court of Appeals, raising the following issues:

I.      Defendant was denied a fair trial as a result of court rulings and prosecutorial misconduct.

      A.      Amendment of information. [The trial court allowed the prosecutor to amend the information over petitioner's objection.]

      B.      Polygraph results. [The prosecutor mentioned lie detector tests at trial.]

> II.     The defendant's guilty verdict is against the great weight of the
> evidence and should be reversed and a new trial order[ed].

The Court of Appeals affirmed petitioner's conviction in an unpublished per curiam opinion. *People v. Church*, No. 204627 (Mich. App. July 19, 1999).  The court also denied petitioner's motion for a rehearing.  *People v. Church*, No. 204627 (Mich. App.) (Order, Sept. 22, 1999).

Petitioner then filed a delayed application for leave to appeal with the Michigan Supreme Court stating the following issue:

> Defendant's timely request for expert reports under MCR 6.201,
> which were required to be provided to him, and which contain not
> only exculpatory evidence but new evidence that would affect the
> verdict, merits this case being remanded to the trial court for a motion
> for a new trial or a new trial being ordered.

Petitioner's delayed application for leave to appeal sought relief in the alternative:

> [1] [Petitioner] seeks to have this Court review [his] request to have this
> matter brought before the trial Court for a new trial due to the prosecutor's
> failure to supply documents which [petitioner] is entitled to under the
> discovery rule, MCR 6.201, or [2] to remand this matter to the trial Court to
> enable [petitioner] to file a Motion for a New Trial based on the fact that the
> verdict was against the great weight of the evidence, that [petitioner] was
> denied access to exculpatory evidence, and that the exculpatory evidence is
> "new evidence."

Delayed Application for Leave to Appeal at 4.  The Michigan Supreme Court ordered the prosecutor to file an answer and brief to the delayed application to discuss "the issue raised in the Court of Appeals concerning the great weight of the evidence." *People v. Church*, No. 115828 (Mich. May 23, 2000).  After reviewing the prosecutor's response, the Michigan Supreme Court denied petitioner's application because it was not persuaded that the issues presented should be reviewed. *People v. Church*, No. 115828 (Mich. Sept. 19, 2000).

2

On February 1, 2001, petitioner filed a motion for relief from judgment pursuant to MCR 6.500 *et seq. See* docket no. 17. The trial court denied his motion, finding that petitioner's issues raised were either raised on appeal and rejected by the Michigan Court of Appeals and the Michigan Supreme Court or could have been raised on appeal. *People v. Church*, Kent Circuit Court Case No. 96-13935-FC (Opinion and Order, May 1, 2001). The trial court further found that petitioner failed to show either "good cause" or "actual prejudice" as required under MCR 6.508(D)(3)(a) and (b). *Id.* Petitioner raised the following issues in his delayed application for leave to appeal to the Michigan Court of Appeals:

I.      [Petitioner] is entitled to post-appellate relief under MCR 6.508(D) et seq.

II.     This court should grant leave to appeal because any of the issues raised in his motion for relief from judgment are meritorious.

  A.    [Petitioner] was deprived of his right to due process of law under US Const Ams V, XIV; Mich Const 963, Art 1, § 17, where the evidence was insufficient to prove beyond a reasonable doubt the elements of second-degree murder, and where the verdict is not supported by the great weight of the evidence.

  B.    [Petitioner] was deprived of his right to due process of law, guaranteed by U.S. Const, Ams V and XIV; Mich Const 1963, Art 1, § 17 where the trial judge gave an erroneous instruction of reasonable doubt.

  C.    [Petitioner] was deprived of his right to due process under the U.S. Constitution, Ams V, XIV; Mich Const 1963, Art 1, §§ 17 & 20, where the prosecution improperly commented on [petitioner's] silence during trial.

  D.    The prosecutor deprived [petitioner] of his state and federal constitutional due process rights to a fair trial that is guaranteed by U.S. Const. Ams V, XIV; Const

3

1963, Art 1, § 17, by engaging in repeated and prejudicial misconduct.

E.     [Petitioner] was deprived of his rights to due process and effective assistance of counsel guaranteed by the U.S. Const, Ams VI, XIV; Mich Const 1963, Art 1, §§ 17 & 20 by the deficient performance of his attorney at trial, and on appeal.

The Michigan Court of Appeals denied petitioner's delayed application for leave to appeal because petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Church*, No. 234571 (Mich. App. Sept. 18, 2001).  Petitioner raised the same issues in his application for leave to appeal to the Michigan Supreme Court, which was denied because petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Church*, No. 120137 (Mich. March 4, 2002).

Petitioner subsequently filed a petition for writ of habeas corpus in this court, pursuant to 28 U.S.C. § 2254, raising the following claims:

I.     Petitioner was deprived of his right to due process of law because conviction resulted from insufficient evidence, and verdict was against the great weight of the evidence.

II.    Petitioner was deprived of his right to due process of law where the trial court gave an erroneous instruction on reasonable doubt.

III.   Petitioner was deprived of his right to due process of law where the prosecutor improperly commented on petitioner's silence during trial.

IV.    Petitioner was deprived of his due process rights to a fair trial because of the prosecutor engaging in repeated and prejudicial misconduct.

V.     Petitioner was deprived of his right to due process and effective assistance of counsel by the deficient performance of his attorney at trial and on appeal.

4

Petition at ¶ 14.  Petitioner supplemented his petition with a 25-page brief previously submitted to the Michigan Supreme Court.  *See* Mich. Sup. Ct. Brief attached to Petition. Petitioner also filed supplemental authority consisting of an article from the State Appellate Defender's *Criminal Defense Newsletter*, entitled "Junk Science in SBS (Shaken Baby Syndrome) and Child Head/Brain Injuries: A Case Study."  *See* docket no. 32.

## Discussion

### I.    Procedural Default

Petitioner seeks relief under 28 U.S.C. §2254 which provides that "a district judge shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  Where the petitioner is prevented from seeking review in the state courts as a result of his own default, the doctrine of procedural default prevents the habeas court from entertaining a petition for writ of habeas corpus.

Respondent contends that all of petitioner's claims are procedurally defaulted.  While most of petitioner's claims appear procedurally defaulted, some claims are not, such as petitioner's claim that his appellate counsel provided ineffective assistance by failing to properly preserve or raise a "great weight of the evidence" claim on appeal.[1]  In addition, petitioner makes a general claim that his appellate counsel was ineffective for failing to appeal other meritorious issues raised in his

---

[1]  Petitioner raised his claim of ineffective assistance of appellate counsel in his motion for relief from judgment. *See Hicks v. Straub*, 377 F.3d 538, 558 n. 17 (6th Cir. 2004), *cert. den.*, -- U.S. -- (March 21, 2005)  (state collateral review under MCR 6.500 *et seq.* is the first opportunity that petitioner had to address the issue of ineffective assistance of appellate counsel); *Tucker v. Renico*, 317  F.Supp.2d  766, 773 (E.D. Mich. 2004) (observing that a petitioner's post-conviction motion filed pursuant to MCR 6.500 is "the first practical opportunity to address the issue [of ineffective assistance of appellate counsel] in state court").

5

Case 1:02-cv-00231-WAM-HWB   ECF No. 39 filed 05/04/05   PageID.85   Page 6 of 29


post-conviction motion. Such a claim could be construed as an argument that all of petitioner's procedurally defaulted claims were caused by the ineffective assistance of his appellate counsel. The court typically addresses a petitioner's procedurally defaulted claims first. However, in the present case, the court must address a number of legal questions simply to determine which of petitioner's federal habeas claims are barred by the doctrine of procedural default. For example, the court must review the merits of each procedurally defaulted claim to determine whether defendant's appellate counsel should have brought the claim on appeal. *See, e.g., Willis v. Smith*, 351 F.3d 741, 745 (6th Cir. 2003) ("in order to determine whether cause [i.e., ineffective assistance of counsel] exists for the procedural default of [petitioner's] ineffective assistance of trial counsel claim, we must, ironically, consider the merits of that claim"). Given these considerations, the court will dispense with a lengthy procedural default analysis and simply review the merits of petitioner's claims.[2]

## II.         Standard of Review under 28 U.S.C. § 2254

The court will review petitioner's claims pursuant to 28 U.S.C. § 2254, which provides in pertinent part that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication–

---

[2] "[J]udicial economy sometimes dictates reaching the merits if the merits are more easily resolvable against a petitioner while the procedural bar issues are complicated." *Barrett v. Acevedo*, 169 F.3d 1155, 1161-62 (8th Cir. 1999) (internal citations omitted), *citing Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997). *See also, Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999) (magistrate judge properly decided the case on the merits where procedural default issue raised more questions than the merits of the case); *Johnson v. Warren*, 344 F.Supp.2d 1081, 1089 (E.D. Mich 2004) (given complexity of determining procedural default, court addressed claims on the merits). *Cf.* 28 U.S.C. § 2254(b)(2) (permitting a federal court to deny a habeas petition on the merits notwithstanding the applicant's failure to exhaust state remedies).

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 405 (2000), the Supreme Court interpreted 28 U.S.C. § 2254(d)(1) as creating a distinction between decisions that are "contrary to" and those that involve an "unreasonable application of" clearly established Supreme Court precedent. *Johnson v. Bell*, 344 F.3d 567, (6th Cir. 2003).

> A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." [*Williams*, 529 U.S. at 405]. A state court decision is also "contrary to" Supreme Court precedent if the state court "applies a rule that contradicts the governing law set forth" in that precedent. *Id.*

*Id.* An "unreasonable application" of clearly established Supreme Court precedent occurs "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.*, (*quoting Williams*, 529 U.S. at 407). "An unreasonable application of law is not, according to the Supreme Court, merely incorrect; rather, 'that application must also be unreasonable.'" *Magana v. Hofbauer*, 263 F.3d 542, 546-47 (6th Cir. 2001) (*quoting Williams*, 529 U.S. at 411).

A determination of a factual issue by a state court is presumed to be correct.  28 U.S.C. § 2254(e)(1).  This presumption applies to factual findings made by a state appellate court.

*Sumner v. Mata*, 449 U.S. 539, 546-47 (1981).  A habeas petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence that the state court's determination was erroneous.  28 U.S.C. § 2254(e)(1).

> A.   **Appellate counsel failed to raise "great weight of the evidence" and "sufficiency of the evidence" claims (Issue I)**

In *Strickland v. Washington.* 466 U.S. 668, 687 (1984), the Supreme Court set forth a two-prong test to determine ineffective assistance of counsel: (1) the defendant must show that counsel's performance was deficient and (2) the defendant must show that counsel's deficient performance prejudiced the defense, i.e., "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."   Appellate counsel enjoys a strong presumption that the alleged ineffective assistance falls within the wide range of reasonable professional assistance.  *See Willis v. Smith*, 351 F.3d at 745, *citing Strickland*. It is not necessary for appellate counsel to raise every non-frivolous claim on direct appeal. *Smith v. Murray*, 477 U.S. 527, 536 (1986);  *Jones v. Barnes,* 463 U.S. 745 (1983).  On the contrary,

> Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.

*Jones*, 463 U.S. at 751-52.   It is well-recognized that the effect of adding weak arguments to an appellate brief "will be to dilute the force of the stronger ones."  *Id.* at 752, *quoting* R. Stern, *Appellate Practice in the United States* 266 (1981).  "[I]f you cannot win on a few major points, the others are not likely to help, and to attempt to deal with a great many in the limited number of pages allowed for briefs will mean that none may receive adequate attention."  *Id.*  As a general rule, "only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome."  *Smith v. Robbins*, 528 U.S. 259, 288 (2000), *quoting  Gray v. Greer,* 800 F.2d 644, 646 (7th Cir.1986).  In this regard, appellate counsel cannot be ineffective for

failing to raise an issue that lacks merit.  *Willis*, 351 F.3d at 745; *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001).

In the present case, Attorney John Pyrski represented petitioner both at the trial and on appeal.  In his capacity as appellate counsel, Mr. Pyrski raised three issues on appeal.  First, that petitioner was prejudiced when the trial court allowed the prosecutor to amend the information, stating that the injury occurred "on or about the 28th through the 29th of October, 1996" rather than October 28, 1996.  Second, that the prosecutor improperly commented on the use of lie detector tests.  Third, that petitioner's guilty verdict was against the great weight of the evidence and that it should be reversed and a new trial ordered.  The Michigan Court of Appeals affirmed the conviction, concluding that the amended information did not prejudice petitioner; that the prosecutor's comment was error, but not reversible error; and that petitioner's motion for a new trial was not properly preserved for appellate review.  *People v. Church*, No. 204627 (Mich. App. July 13, 1999).

1.      **"Great weight of the evidence" versus "Sufficiency of the evidence"**

Petitioner has intermingled two separate claims in his petition.  First, petitioner contends that his appellate counsel was ineffective for failing to properly preserve and raise a "great weight of the evidence" claim.  By way of background, although petitioner's appellate counsel brought this claim on appeal, the Michigan Court of Appeals did not review the claim because it was unpreserved at the trial court level.[3]  Second, that appellate counsel failed to raise a sufficiency of

---

[3] The Michigan Court of Appeals declined to address petitioner's great weight of the evidence claim, because the claim was not properly preserved for appellate review:

Defendant filed a postconviction motion for a new trial; however, he only challenged the exclusion of expert testimony, the amendment of the information, and the propriety of the prosecutor's reference to the lie detector test during rebuttal argument. Defendant did not argue that the verdict was against the great weight of the evidence, or otherwise challenge the sufficiency of the evidence, in his motion for new trial.

*People v. Church*, No.204627, slip op. at 3, fn 1.

the evidence claim.  Although petitioner appears to treat these two issues as interchangeable, they are distinct legal claims and merit separate treatment.

MCR 6.431 provides that "[o]n the defendant's motion, the court may order a new trial on any ground that would support appellate reversal of the conviction or because it believes that the verdict has resulted in a miscarriage of justice."  Pursuant to MCR 6.431, Michigan state court judges may grant a criminal defendant a new trial on the ground that the verdict was against the great weight of the evidence. *See People v. Stiller*, 242 Mich.App 38, 49; 617 NW2d 697 (2000). A trial court's denial of a motion for a new trial is reviewed under an "abuse of discretion" standard. *Id*. When a trial court denies a motion for new trial, the appellate court may reverse this decision if the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. *People v. Lemmon*, 456 Mich. 625, 627, 644; 576 N.W.2d 129 (1998); *People v. Gadomski*, 232 Mich.App 24, 28; 592 NW2d 75 (1998).

Michigan courts have struggled with defining the extent to which a trial judge can overrule a jury's guilty verdict and order a new trial.  "The conundrum is that, in motions for a new trial based on the claim that the verdict is against the great weight of the evidence, the issue of credibility of the witnesses is implicit in determining great weight or overwhelming weight of that evidence." *Lemmon*, 456 Mich. at 638.  In *People v. Herbert*, 444 Mich. 466; 511 N.W.2d 654 (1993), the Michigan Supreme Court held that the trial court could grant a defendant's motion for a new trial if the verdict was against the great weight of the evidence and that a trial judge may grant a new trial on the ground that he disbelieves the testimony of witnesses for the prevailing party. *See Herbert*, 444 Mich. at 475-76.  In ruling on a motion for a new trial, the trial judge acts "as the thirteenth juror," evaluating the credibility of the witnesses and their demeanor. *See id.* at 475-77. The Michigan Supreme Court pointed out that while "a judicial determination regarding the weight of the evidence can be the basis for a new trial," such a determination could not be grounds for granting a directed verdict of acquittal. *Id.* at 477. The court relied on the concurring opinion of Judge Frank in *Dyer v. MacDougall*, 201 F.2d 265, 272-72 (2nd Cir. 1952), that on a motion for a

10

new trial, a "verdict may be set aside as contrary to the preponderance of the evidence, although a directed verdict is not justified." *Id.* at 476.

The Michigan Supreme Court subsequently overruled *Herbert* to the extent it permitted trial judges "to grant new trial motions on the basis of a disagreement with juror assessment of credibility." *Lemmon*, 456 Mich. at 627. Under the new standard, "[a] trial judge does not sit as the thirteenth juror in ruling on motions for a new trial and may grant a new trial only if the evidence preponderates heavily against the verdict so that it would be a miscarriage of justice to allow the verdict to stand." *Id.* By eliminating the "thirteenth juror" rule, *Lemmon* limited the trial judge's discretion to overrule a jury's verdict. Under *Lemmon*, the trial judge must determine that witness testimony is so seriously undermined (e.g., so inherently implausible that it could not be believed by a reasonable juror) and that there is a real concern that an innocent victim may have been convicted. *Id.* at 644 (quotation marks omitted). "If the 'evidence is nearly balanced, or is such that different minds would naturally and fairly come to different conclusions,' the judge may not disturb the jury findings although his judgment might incline him the other way." *Id.* The court further held that "[c]onflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial." *Id.* at 647.

A state prisoner's claim that the jury verdict was against the great weight of the evidence is considered to be a state law claim not cognizable on federal habeas review. *See Young v. Kemp*, 760 F.2d 1097, 1105 (11th Cir.1985) ("[a] federal habeas court has no power to grant habeas corpus relief because it finds that the state conviction is against the 'weight' of the evidence"); *Cukaj v. Warren*, 305 F. Supp. 2d 789, 796 (E.D. Mich. 2004) (federal courts have "no power to grant habeas relief on a claim that a state conviction is against the great weight of the evidence"); *Crenshaw v. Renico*, 261 F.Supp.2d 826, 834 (E.D.Mich.2003).[4]

_____

[4] The court notes that some courts have concluded that this state law claim could raise a federal constitutional issue if the record is "devoid" of evidentiary support for the conviction. *See, e.g., Douglas v. Hendricks*, 236 F.Supp.2d 412, 435-36 (D.N.J. 2002) ("[a] claim that the verdict is against the weight of the evidence is essentially a matter of state law, and does not raise a federal constitutional question unless the

On the other hand, a sufficiency of evidence claim arises from the federal due process requirement that the prosecution present evidence sufficient to convict a criminal defendant.   In *In re Winship*, 397 U.S. 358 (1970), the Supreme Court held that Fourteenth Amendment's Due Process Clause protects a criminal defendant against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Winship*, 397 U.S. at 364.   The federal due process standard as set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), states that sufficient evidence supports a conviction if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original).   In applying the *Jackson* standard, the reviewing court must presume that the trier of fact resolved conflicting inferences of fact in favor of the prosecution, and must defer to that resolution. *Wright v. West*, 505 U.S. 277, 296-97 (1992).

A critical distinction between a reversal on the ground that the verdict was against the great weight of the evidence and a reversal for insufficient evidence lies in the effect of the respective reversal.   A trial judge's decision that a jury verdict is against the weight of the evidence results in a new trial, <u>not</u> an acquittal.   *See* MCR 6.431; *Tibbs v. Florida*, 457 U.S. 31, 32 (1982) (holding that a reversal based on the weight of the evidence, rather than the sufficiency of the evidence, permits the state to initiate a new prosecution). "A reversal based on the weight of the evidence . . . can occur only after the State has presented sufficient evidence to support conviction and has persuaded the jury to convict.   The reversal simply affords the defendant a second opportunity to seek a favorable judgment." *Tibbs*, 457 U.S. at 42-43.   On the contrary, an appellate determination that the prosecution proffered insufficient evidence of guilt "is comparable to an acquittal, and the Double Jeopardy Clause precludes a second trial." *Monge v. California*, 524 U.S.

_____

record is completely devoid of evidentiary support in violation of [p]etitioner's due process"); *Griggs v. State of Kansas*, 814 F.Supp. 60, 62 (D.Kan.1993) ("[a] claim that the verdict was against the weight of the evidence is not of constitutional dimension unless the record is so devoid of evidentiary support that a due process issue is raised").

721, 729 (1998).  *See Burks v. United States*, 437 U.S. 1, 5-18 (1978); *Greene v. Massey*, 437 U.S. 19, 24 (1978).

Having identified the two different legal issues raised by petitioner, the court will now examine the record to determine whether petitioner's counsel was ineffective for failing to properly raise either the great weight of the evidence issue or the insufficiency of the evidence issue.

### 2.    Evidence presented at trial

The prosecutor presented evidence at trial that the victim's mother delivered him to petitioner's residence sometime after 9:00 p.m. on October 28, 1996.  Trial Trans. IV at 114-16. When the victim was left at petitioner's residence, he was crying, eating and playful. *Id.* at 114-17. Petitioner told Calvin Rankin, a hospital social worker, that he was providing child care for the victim that night, that at about 4:45 a.m. on October 29th the child became irritable and started screaming and crying.  *Id.* at 105.  Petitioner tried to calm the child down, attempted to give him food and arranged to bring him to the hospital.  *Id.*   Petitioner made no other statements to Mr. Rankin.  *Id.*  Mr. Rankin testified that he completed a form to report suspected child abuse or neglect after receiving information from hospital physicians that the victim "had massive bleeding  in his brain, which was indicative of Shaken Baby Syndrome." *Id.* at 106.

Petitioner made similar statements to Detective Emaus: that the victim awoke crying at approximately 4:45 a.m., that he woke up his sister at that time because the victim had one eye open and the other closed and that he called the victim's grandmother to come and get the child. Trial Trans. V at 545, 550.  The victim's grandmother drove the child to the hospital shortly thereafter.  Trial Trans. IV at 6-10.

Petitioner's sister, Karlene Church, testified that when she arrived at petitioner's residence at 11:30 p.m., she observed her own children (aged 6 and 8) sleeping in bed, the victim sleeping on the living room floor and petitioner sleeping in a recliner in the living room.  *Id.* at 61-62, 66-69.  Ms. Church testified that it was routine for her to check on the victim, because he had been throwing up periodically over the previous three weeks.  *Id.* at 67-69.  Ms. Church went to bed

13

after observing the victim sleeping and breathing normally.  *Id.*  Ms. Church and petitioner were the only adults in the house at that time.  *Id.* at 66, Trial Trans. V at 615.   Ms. Church testified that the next thing she remembered was petitioner waking her up at about 4:40 a.m. and telling her that the victim was not acting normally.  Trial Trans. IV at 69, 97.  She testified that when she picked up the victim he became stiff, that the victim had one eye open, that the victim moaned, that the victim relaxed when she put him down, but then a few minutes later the victim stiffened back up.  *Id.* at 70-71.  Ms. Church denied shaking the victim during the night of October 28th and the early morning hours of October 29th.  *Id.* at V, 615.

Dr. Drew, a treating emergency room physician, testified that the victim was not acting like a normal six-month old child when he arrived at the emergency room.  Trial Trans. IV at 34-36.  The child was exhibiting symptoms of suffering from a seizure or brain abnormality.  *Id.* at 35-37. Dr. Stoiko, a pediatrician trained in the management of children with life threatening injuries, testified that when he viewed a CAT scan of the victim's head at approximately 6:20 a.m. on October 29th, the victim was suffering from a severe brain injury in which areas of his  "cerebral cortex, where one does most of one's thinking, movements, functioning, speech, vision and so on," appeared to be dead or in the process of dying.  *Id.* at 168.  Based on his examination of the victim, Dr. Stoiko concluded that the victim "suffered a severe shaking-type injury, a forceful shaking of the type that would produce massive tearing, ripping and also a homogenizing effect of his brain of a violent nature that could not have accidentally [sic] or with the usual nature that children receive [sic]."  *Id.* at 172.

The doctor described the term "homogenizing effect" as follows:

> Obviously it's referring to milk in the concept of mixing milk in such a way as to keep the fat, the cream layer, from separating from the milk, and specifically in this case refers to the fact that when a child is being violently shaken back and forth and the head is snapping forward and backward the various parts of the brain will be swinging back and forth at different rates, just like pendulums that are different weights would swing at different rates, and the problem is that one part of the brain may be stopping and coming forward again while the other part is traveling backwards, and in fact you will

> actually get twisting, turning, shearing movements within the brain that will actually cause the brain itself to be torn and ripped and mixed and that's in fact what happened to [the victim's] brain.

*Id.* at 173. The doctor characterized this injury as "about as severe a brain injury as one can undergo." *Id.* at 174. The doctor testified that the victim's "brain was virtually destroyed by this episode" and that "he was killed almost immediately by the shaking, in a very short time. *Id.* at 176.

Dr. Stoiko also testified that victim, given his serious injury, could not cry after such a severe shaking and could only survive a few hours, maybe less, without medical attention. *Id.* at 177. The doctor testified that he was "very comfortable" with the opinion that "this child likely received those injuries within the early morning hours of the 29th," and that he had "no doubts that this child suffered a severe shaking injury in the early morning hours before I saw him." *Id.* at 182. Finally, Dr. Stoiko testified that with these severe injuries, it was not possible for the victim to have been injured sometime around 9:00 or 9:30 p.m. on October 28th (prior to the time the child was dropped off at petitioner's residence), stating that "I don't think [the victim] would have survived until 6:00 in the morning if he had received this severe brain injury the night before without medical care." *Id.*

### 3.    Great weight of the evidence claim

Petitioner was convicted of second-degree murder, MCL § 750.317, which involves the killing of a human being with malice aforethought, meaning that the prosecution must establish that petitioner possessed the intent to kill, the intent to commit great bodily harm, or the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. *See Aldrich v. Bock*, 327 F. Supp. 2d 743, 762 (E.D. Mich. 2004); *People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984).

Based on this evidence, a reasonable juror could conclude beyond a reasonable doubt that petitioner was guilty of second degree murder, i.e., the killing of a human being with the intent to kill, the intent to commit great bodily harm, or the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. *See Aldrich*,

15

327 F. Supp. 2d at 762; *Dykhouse*, 418 Mich. at 495.  The victim was left in petitioner's care at about 9:00 to 9:30 p.m. on October 28th until he was brought to the hospital sometime after 4:45 a.m. on October 29th.  Petitioner was sleeping in the same room as the victim.  The only other adult in the residence, Ms. Church, observed the victim as sleeping and breathing normally at 11:30 p.m. Ms. Church denied that she shook the victim.  She only became aware of the victim's condition after petitioner woke her at about 4:40 a.m. on October 29th, at which time she observed the victim to be acting abnormally.  Plaintiff admits awakening Ms. Church after the baby began acting abnormally. Dr. Stoiko's testimony indicates that the victim suffered from a violent, severe shaking-type, fatal injury that was not typical of an accident.  The doctor further testified that, in his opinion, given the extent of the injuries, the victim must have been injured during the early morning hours of October 29th.

        Even if petitioner's counsel had properly preserved the great weight of the evidence issue at the trial court level, the Michigan Court of Appeals would have had no basis to order a new trial. *See Lemmon*, 456 Mich. at 644.[5]   The verdict in this case was clearly not contrary to any evidence other than petitioner's own statements.  Neither the trial court nor the appellate court had a basis to disturb the jury findings as being against the great weight of the evidence under the standards announced in *Lemmon*, 456 Mich. at 644, 647.   None of the evidence was so inherently implausible  that it could not be believed by a reasonable juror.  *Id.* at 644.  Nor did the evidence preponderate so heavily against the verdict that it would have been  a miscarriage of justice to allow the verdict to stand.  *Id.* at 627.    Even though counsel failed to preserve this issue for appellate review, he was not constitutionally ineffective, because petitioner's great weight of the evidence claim was meritless.   Counsel  cannot be found ineffective for failing to raise a meritless issue. *Greenup v. United States*, -- F.3d -- (6th Cir. March 29, 2005), slip op. at 9; *Willis*, 351 F.3d at 745.

---

        [5]  Because petitioner's case was on appeal at the time of the *Lemmon* decision (March 24, 1998), the rule expressed in *Lemmon* applies.  *See Lemmon*, 456 Mich. at 648 (holding "that the newly adopted limitations on *Herbert* apply prospectively to cases not yet final as of the date of this decision").

Accordingly, petitioner's claim that he received the ineffective assistance of appellate counsel in violation of the Sixth Amendment fails.

### 4.    Sufficiency of the evidence

As the court previously discussed, a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of second degree murder beyond a reasonable doubt. Sufficient evidence supported petitioner's conviction. *See Jackson*, 443 U.S. at 319. Petitioner's appellate attorney was not ineffective for failing to raise an issue that was without merit. *Greenup*, -- F.3d --, slip op. at 9; *Willis,* 351 F.3d at 745. Accordingly, petitioner's claim that he received the ineffective assistance of appellate counsel in violation of the Sixth Amendment fails.

### B.    Erroneous instruction (Issue II)

Next, petitioner contends that appellate counsel should have appealed the trial court's improper use of Michigan Standard Criminal Jury Instruction (CJI2d) 3.2 regarding "reasonable doubt." Petitioner's contention is without merit. The Sixth Circuit has held that this standard jury instruction satisfies the 14th Amendment's due process clause. *Binder v. Stegall*, 198 F.3d 177 (6th Cir. 1999). Petitioner's appellate attorney was not ineffective for failing to raise this meritless issue. *Greenup*, -- F.3d -- , slip op. at 9; *Willis*, 351 F.3d at 745. Accordingly, petitioner's claim that he received ineffective assistance of appellate counsel in violation of the Sixth Amendment fails.

### C.    Prosecutorial Misconduct (Issues III and IV)

Next, petitioner contends that prosecutorial misconduct, either through individual acts or by their cumulative effect, violated his due process rights. Prosecutorial misconduct must be so egregious as to deny petitioner a fundamentally fair trial before habeas corpus relief becomes available. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974); *Hutchison v. Bell*, 303 F.3d 720, 750 (6th Cir. 2002). "When a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor.'" *Serra v. Michigan Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir.1993) (*quoting Smith v. Phillips*, 455 U.S.

209, 219 (1982)). "The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation and internal quotations omitted). The appropriate standard of review for a prosecutorial misconduct claim on a writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.* The court should consider four factors in determining whether a prosecutorial remark rises to the level of a due process violation: "(1) whether the remark tended to mislead the jury or to prejudice the accused; (2) whether the remark was isolated or extensive; (3) whether the remark was accidentally or deliberately placed before the jury; and (4) the strength of the evidence against the accused." *Hutchison*, 303 F.3d at 750.

Here, petitioner contends that the prosecutor misstated facts to the radiologist, Dr. Junewick, and made improper remarks during closing argument regarding petitioner's silence at trial, regarding evidence related to the victim's time of death, comparing petitioner to an infamous person, and evoking juror sympathy for the victim and his mother.

### 1.    Prosecutor misstated facts to Dr. Junewick

Petitioner contends that the prosecutor misstated facts to a radiologist, Dr. Junewick, to confuse the doctor. Mich. Sup. Ct. Brief at 18-19. Specifically, petitioner states that the prosecutor indicated to Dr. Junewick that the victim was admitted to the hospital on October 28, 1997 [sic] and that the victim had been hospitalized for 24 hours before a CAT (CT) scan was performed. *Id.* Petitioner further contends that Dr. Junewick's "memory was hazy," and that the doctor "just agreed" with the prosecutor's statements before he testified that the victim had a "massive swelling (edema) of the brain." *Id.* Petitioner described the significance of these misstated facts:

> The significance of this "massive swelling" is of the utmost importance. For the brain to swell to that extent, it had to have been swelling for several hours. The onset of the swelling could extend back to when the mother had [the victim] in her care. Therefore, any injury sustained by the child would have been inflicted by the mother.

*Id.* at 19.  Petitioner contends that the prosecutor's tactics are grounds for reversal because it resulted in an unfair trial violating his Due Process rights.  *Id.*

Dr. Junewick testified that the CT scan of the brain was performed at about 6:30 a.m. on October 29, 1996, approximately 24 hours after the victim was admitted.  Trial Trans. III at 436-37.  This testimony is incorrect, in that the victim was admitted to the hospital at 5:55 a.m. on October 29, 1996.  Autopsy Report attached to Petition as App. A.  The doctor testified that the CT scan showed a "fairly abnormal appearing brain, with hemorrhage between the brain and the skull," and a massive edema (swelling) of the brain.  Trial Trans. III at 437.  While Dr. Junewick concluded that the victim suffered a non-accidental injury, *id.* at 440, his testimony did not establish a time for the injury.  The doctor testified on both cross-examination and re-direct examination that, based on the CT scan, he could only conclude that the injury occurred within zero to seven days of the scan.  Trial Trans. III at 447-50.  In a hypothetical question posed to clarify the usefulness of a CT scan in determining the time of an injury, the doctor testified that the CT scan of a child who suffered head injuries in a car accident a few blocks away and was "raced" to the hospital would look identical to the victim's CT scan, and that he would not be able to use the CT scan to determine when the hypothetical car accident occurred.  *Id.* at 449-50.

Nothing in Dr. Junewick's testimony supports petitioner's speculation that the victim's "massive edema of the brain" proved that the victim's mother inflicted the injury prior to dropping the victim off at petitioner's residence.  On the contrary, Dr. Junewick testified that swelling in the head would progress rapidly if the victim suffered a ruptured artery, and that a CT scan of an injury from a car accident "ten minutes ago" could show a subdural hemorrhage like that suffered by the victim. *Id.* at 443-44.

While the prosecutor misstated that the victim's CT scan occurred 24 hours after his admission to the hospital, Dr. Junewick testified on both cross-examination and re-direct examination that he could not use the CT scan to establish a time frame for the victim's injury with any more specificity than having occurred within "zero to seven days" prior to the CT scan.  The jury

19

could not have relied on Dr. Junewick's testimony to establish the time of the victim's death. Accordingly, petitioner was not prejudiced by the prosecutor's misstatement that the CT scan occurred about 24 hours after the victim was admitted to the hospital.

### 2.    Petitioner's silence at trial

During closing argument, the prosecutor stated as follows:

> You've heard no evidence that in this case at all that the person who did this didn't do it with the intent -- nobody got up there and said that the defendant didn't mean to do it.  "Oops, I didn't know you weren't supposed to shake the baby," nobody said that. . . .
>
> So ladies and gentlemen, I don't think that any of this is contested at all.  I think this is proven well beyond a reasonable doubt based on the evidence that you have before you.  There is no evidence to the contrary.  So you can relax and know that this element is met.

Trial Trans. VI at 695-97.[6]

As a general rule, the prosecution cannot comment on a defendant's decision not to testify at trial.  *See Griffin v. California*, 380 U.S. 609, 615 (1965); *Bowling v. Parker*, 344 F.3d 487, 514 (6th Cir. 2003).  However, a prosecutor can "summarize the evidence and comment on its quantitative and qualitative significance."  *Bowling*, 344 F.3d at 514, *quoting United States v. Bond*, 22 F.3d 662, 669 (6th Cir. 1994).  When a statement indirectly comments on the defendant's decision not to testify, the court uses four factors to evaluate such comments: 1) where the comments manifestly intended to reflect on the accused's silence or of such a character that the jury would naturally and necessarily take them as such; 2) were the remarks isolated or extensive; 3) was the evidence of guilt otherwise overwhelming; 4) what curative instructions were given.  *Bowling*, 344 F.3d at 514.

Here, the prosecutor's isolated reference to petitioner's silence at trial occurred as she summarized the evidence.  Immediately after the quoted comments, the prosecutor reminded the jury that "[n]o doctor got up here and said it was an accident."  Trial Trans. VI. at 696.  Later in her

---

[6] Petitioner incorrectly cites these passages as from Trial Trans. V.  *See* Mich. Sup. Ct. Brief at 13.

argument, the prosecutor referred to petitioner's statements made to Calvin Rankin (the hospital social worker) that the victim was fine before 4:45 a.m. *Id.* at 699-700.  The prosecutor also referred to the testimony of the victim's mother, the victim's grandmother and petitioner's sister regarding the victim's medical history  *Id.* at 699-704.  Given this record, it is fair to conclude that the prosecutor's comments were part of a summary of the evidence in an otherwise strong case against petitioner in which she compared petitioner's previous, out-of-court statements with the testimony given by other witnesses at trial.  Furthermore, any prejudice to petitioner was mitigated, if not cured, by the court's later instruction to the jury that they "must not consider the fact that [petitioner] did not testify."  Trial Trans. VI at 767.  Accordingly, the prosecutor's comments did not constitute prosecutorial misconduct that deprived petitioner of a fundamentally fair trial.

### 3.    Prosecutor's statements regarding the victim's time of death

Next, petitioner contends that the prosecutor misstated the pathologist's conclusions regarding the victim's survival time after the shaking, when she told the jury to establish the time of injury by subtracting 36 hours from the victim's time of death.  Mich. Sup. Ct. Brief at 15-16. Petitioner contends that the prosecutor's statement effectively told the jury to convict him because petitioner was caring for the victim 36 hours prior to the victim's death.  *Id.*  Petitioner contends that this 36-hour timeline should have been pushed back three or four hours, when the victim was with his mother, because the swelling could have occurred three to four hours after the fatal injury. *Id.*[7]

In her closing argument, the prosecution referred to the autopsy report of the pathologist, Dr. Cohle, stating in pertinent part as follows:

> The whiplash shaking syndrome is what causes the death, and he [the doctor] calls the manner of death homicide.
>
> On the whiplash shaking, it says approximately 36 hours survival, 36 hours back.  We went back in time with Dr. Cohle , and Dr. Cohle -- 36 hours is a day-and-a -half and it puts it right back to midnight, which is nine, ten, two hours after mother left.  There is just

---

[7] Petitioner supports his contention with the following citation "Swelling can start to occur three to four hours after the fatal injury. (Tr. Vol. II, 370)."  No such statement appears at that citation.

no way [sic]. He [i.e., petitioner] is the only person that could have --
I'm sorry, longer than that. He's the only person who could have
caused those injuries, even by Dr. Cohle's report.

Trial Trans. VI at 752-53.

Dr. Cohle's autopsy report states that the victim's death was a homicide and that the

cause of death was "craniocerebral trauma (whiplash shaking syndrome)." Autopsy Report attached

to Petition as App. A. The final diagnosis of whiplash shaking syndrome included two subparts: (a)

recent retinal and subdural hemorrhages and (b) anoxic encephalopathy (approximately 36 hours

survival). *Id.* In addition to the cause of death, the autopsy included an additional diagnosis of

"subacute (5 to 10 day) subdural hemorrhage." *Id.* The subacute ("old") injury was not lethal,

having "a very scant amount of hemorrhage," and was consistent with some type of substantial blow

to the head. Trial Trans. II at 362.[8] Dr. Cohle testified that fatal ("fresh") injury occurred "within

36 hours of the child's death, roughly" or "approximately 36 hours before he died." *Id.* at 329-30,

333. In explaining the term "anoxic encephalopathy," the doctor stated that it:

> is a brain condition which is secondary, it can be secondary to injury
> or disease, but it means that the brain has a severe lack of oxygen, and
> usually swelling accompanying that.
>
> And when I say there was anoxic encephalopathy,
> approximately 36 hours of survival, what that means is that I think the
> child survived approximately 36 hours after having an episode of
> severe brain swelling.

*Id.* at 341-42.

Contrary to petitioner's contention, neither the autopsy nor Dr. Cohle's testimony

established that the victim would survive 36 hours after receiving the fatal injury. Dr. Cohle did not

rely on the nature of the victim's injury to determine the victim's time of death (i.e., that the victim

could only survive 36 hours after receiving the injury), but simply noted that the victim was

---

[8] The victim's mother testified that he fell off of a couch and hit his nose on the floor about two
weeks prior to his death. Trial Trans. IV, 137-39. The victim's father also testified that the victim fell from
a couch prior to his death. Trial Trans. III at 386-88. Dr. Cohle testified that it could have been possible for
the victim to have suffered the "old" injury by falling face down on a hard floor from a couch. Trial Trans.
II at 362.

pronounced dead at 2:35 p.m. on October 30, 1996.  *Id.* at 342.  In this regard, the autopsy stated in pertinent part as follows:

> The child remained comatose throughout the hospitalization and was felt to be clinically brain dead since late on the evening of 10/29.  He was pronounced dead at 2:35 PM on 10/30/96.

Autopsy Report at 2.  Dr. Cohle's testimony clarified that 36 hours elapsed from the time that the victim suffered the fatal injury until he was pronounced dead.  Trial Trans. II at 341-42.  Based on this record, the prosecution did not misstate Dr. Cohle's testimony.

### 4.    Comparing petitioner to infamous person

Next, petitioner contends that the prosecutor improperly compared him to an infamous person, i.e., Susan Smith, a woman convicted of murdering her two children.  Mich. Sup. Ct. Brief at 16-17.  The prosecutor briefly referred to Susan Smith in arguing that the jury could not base its decision on character evidence.  Trial Trans. VI at 746.  The prosecutor used Smith as an example of a person who was perceived as a wonderful mother yet convicted of murdering her own children.  *Id.*  This brief reference did not so infect petitioner's seven-day trial with unfairness as to make his conviction a denial of due process.  *See Darden*, 477 U.S. at 181-82 (a prosecutor's reference in closing argument to the petitioner as an "animal" that should not be let loose did not render petitioner's trial fundamentally unfair); *Givens v. Yukins*, No. 98-2429,  2000 WL 1828484 at *6 (6th Cir. Dec. 5, 2000) (prosecutor did not violate the petitioner's due process rights by referring to her as a "liar, thief, drug kingpin and prostitute" in closing argument); *Hooks v. Ward*, 184 F.3d 1206, 1222 (10th Cir. 1999) (prosecutor's reference to mass murderer Charles Manson did not deny petitioner due process).

### 5.    Evoking juror sympathy

Petitioner also contends that the prosecutor improperly evoked juror sympathy for the victim and her mother in closing argument.  Specifically, petitioner objects to the following passage:

> Ladies and Gentlemen, please for the sake of this mother, who's not only lost her son but had to put up with this humiliation

23

and this torment, please for the sake of [the victim], find [petitioner]
guilty.

Trial Trans. VI at 765.  This brief reference to the victim and his mother did not result in a
fundamentally unfair trial.  *See Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (prosecutor did
not act improperly by asking jurors to put themselves in the place of the victim's loved ones).
Furthermore, it appears that these remarks were in response to petitioner's counsel's remarks asking
the jury to "give [petitioner's] life back."  Trial Trans. VI at 739, 764-65.   Criminal defense
counsel's conduct is relevant in determining whether the prosecutor's remarks unfairly prejudiced
the defendant.  *See United States v. Young*, 470 U.S. 1, 11-13 (1984).  Where defense counsel's
remarks invite a response, the prosecutor may respond in order to "right the scale."  *Id.*  Petitioner's
counsel first raised the issue of having the jurors put themselves in his place.  In this context, it was
not impermissible for the prosecutor to raise the same argument with respect to the victim and his
mother.

### 6.      Cumulative effect of prosecutorial misconduct

Finally, petitioner contends that he was denied due process by the cumulative effect
of the prosecutor's misconduct.  Petitioner has failed to demonstrate harm or error resulting from
prosecutorial misconduct.  Accordingly, his claim that the cumulative error of the misconduct
rendered his trial fundamentally unfair is without merit.  *United States v. Sherill*, 388 F.3d 535, 539
(6th Cir. 2004); *Smith v. Mitchell*, 348 F.3d 177, 213 (6th Cir. 2003).

### D.      Ineffective assistance of trial counsel (Issue V)

Petitioner also contends that his trial counsel provided him with ineffective assistance
of counsel. Under *Strickland*, the reviewing court's scrutiny of counsel's performance is highly
deferential, and the court is to presume that counsel rendered adequate assistance and made decisions
with reasonable professional judgment.  *Strickland*, 466 U.S. at 689-690.  "The Constitution does
not guarantee every defendant a successful defense."  *Moran v. Triplett*, No. 96-2174, 1998 WL
382698 at *3 (6th Cir. 1998), *citing Strickland*, 466 U.S. at 690.  Neither does the Constitution

guarantee petitioner "an excellent lawyer" or a "good lawyer." *Id.* at *5, *citing Strickland*, 466 U.S. at 687.  Rather,

> the Sixth Amendment right to the effective assistance of counsel entitles [petitioner] to nothing more than a "reasonably competent attorney" whose performance falls "within the range of competence demanded of attorneys in criminal cases."

*Id.*  A trial counsel's tactical decisions are particularly difficult to challenge when claiming ineffective assistance of counsel. *See  McQueen v. Scroggy*, 99 F.3d 1302, 1311 (6th Cir. 1996); *O'Hara v. Wiggington*, 24 F.3d 823, 828 (6th Cir. 1994).  Accordingly, petitioner must "overcome a presumption that the challenged action might be considered sound trial strategy." *Id.*

### 1.       Trial counsel had insufficient time to prepare

Petitioner contends that his trial counsel, Mr. Pyrski, was ineffective for taking on the case when he only had 20 days to prepare for the trial and failed to develop the case.  Mich. Sup. Ct. Brief at 21-22.  Petitioner presents nothing to support his conclusory statement that his counsel was ineffective due to lack of preparedness.  Petitioner had his preliminary examination on December 23, 1996. *See* docket no. 17.  Petitioner entered a not guilty plea on January 13, 1997. *Id.*  A motion for speedy trial was filed on February 21, 1997. *Id.*  On March 12, 1997, petitioner obtained Mr. Pyrski's services pursuant to a stipulation and order of substitution of attorneys. *Id.*  Petitioner's jury trial commenced on March 31, 1997. *Id.*  Petitioner's specific contention is that his counsel should have obtained experts to determine whether the victim suffered from a "congenital metabolic deficiency" which mimicked "shaking baby syndrome." Mich. Sup. Ct. Brief at 21-22.

In support of this contention, petitioner has presented a letter from a retired forensic pathologist, Peter J. Stephens, M.D., dated May 22, 2001, which is critical of the autopsy and trial counsel, stating in part that "congenital metabolic deficiencies . . . may mimic abusive head injury." Dr. Stephens' letter, prepared more than four years after petitioner's trial, was apparently based upon a review of petitioner's April 21, 2001 letter to the doctor and a copy of the victim's autopsy.

Stephens Letter attached to Petition as App. D.[9]  While Dr. Stephens' letter presents various theories related to the causes of the victim's death and questions regarding the victim's medical condition (including an examination of his mother's prenatal and delivery records), nothing in the letter suggests that Dr. Stephens reviewed the victim's hospital records from October 1996 or transcripts of the seven physicians that testified at petitioner's trial.[10]  Dr. Stephens observed that while a blood test for such metabolic deficiencies existed in 2001, "this might not have been known in 1996." Stephens Letter at 2.  Finally, Dr. Stephens suggested that petitioner give him permission to forward the April 21st letter and autopsy report to another physician, Dr. Plunkett, who "is still in practice" and "has more experience in these cases than do I."  Stephens Letter at 2.  There is no evidence that petitioner gave such permission or that he received a report from Dr. Plunkett.   Under these circumstances, Dr. Stephens' letter appears to be based on unknown assumptions set forth in the April 21st letter, unsupported by the medical evidence given by seven treating and consulting physicians at trial, and  purports to be nothing more than preliminary comments advising petitioner to seek the opinion of a more experienced physician.

Respondent contends that the issue at trial was not how the victim died, but who's actions caused the victim's death.  Respondent states that eight different physicians[11] testified at the trial and that petitioner's counsel re-called two of the physicians (Drs. Stoiko and Cohle) to testify on his behalf.  *See* Answer at 10; Trial Trans. V at 577, 596-607.

---

[9] Petitioner's April 21, 2001 letter, upon which Dr. Stephens apparently relied upon in preparing his opinion, is not part of the court's record.

[10] The seven physicians are: Dr. Cohle (pathologist); Dr. Junewick (treating radiologist); Dr. Powers (treating family physician); Dr. Palusci (pediatrician specializing in child protection or child maltreatment who consulted with Dr. Stoiko on victim's treatment); Dr. Tremea (treating resident in pediatric intensive care unit); Dr. Drew (treating emergency room physician); Dr. Stoiko (treating pediatrician, pediatric intensive care specialist).  Trial Trans. II at 320-76; Trial Trans. III at 434-530; Trial Trans. IV at 34-61, 164-204.

[11]  The record reflects that seven, rather than eight, physicians testified at trial.

"Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. For example, counsel has a duty to investigate all witnesses who may have information concerning his client's guilt or innocence. *See Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

First, after reviewing the record as a whole, I conclude that Mr. Pyrski's conduct at trial was not that of an "unprepared" attorney. He demonstrated an adequate understanding of the legal and factual issues involved in petitioner's case, engaged in vigorous cross-examination of the prosecution's witnesses, moved for a directed verdict, presented nine witnesses on petitioner's behalf, and prompted the prosecution to present two rebuttal witnesses.

Second, Mr. Pyrski did not act unreasonably in not obtaining an expert regarding the existence of the alleged congenital metabolic deficiencies. The facts developed before Mr. Pyrski substituted in as petitioner's counsel indicated that the victim died as a result of a severe shaking injury. At the preliminary examination held on November 20, 1996, and transcribed on December 9, 1996, Dr. Stoiko testified that "without a doubt [the victim] suffered a severe shaking injury, a type of violent shaking injury that nobody would do accidentally or by bouncing him on their knee, but it would have to be done with tremendous force, intentional force to seriously injure or kill [the victim]." Prel. Hear. Trans. I at 12. The autopsy report was completed two months before Mr. Pyrski represented petitioner, bearing a date of December 20, 1996. *See* Autopsy Report at 1. Nothing in the autopsy report or the victim's medical history suggested a cause of death other than by a severe shaking injury. As previously discussed, Dr. Stephens' limited comments were based solely on his review of the autopsy report and on allegations set forth in petitioner's unrecovered letter of April 21, 2001. While Dr. Stephens presented a possible theory for the victim's cause of death due to congenital metabolic deficiencies, he admitted that a blood test for this condition "might not have been known" when the autopsy was performed in 1996.

Petitioner has made no more than conclusory allegations of his counsel's alleged ineffectiveness for failing to obtain an expert to investigate other causes of the victim's death. Based on this record, the court may conclude that Mr. Pyrski acted reasonably in his decision to proceed to trial without obtaining an expert witness to contest the victim's cause of death.

### 2.    Trial counsel tried to seek a proper reasonable doubt instruction

Next, petitioner contends that trial counsel was ineffective for failing to seek a "proper" reasonable doubt instruction. Petitioner's claim is without merit. As the court previously discussed, this instruction was appropriate. *See Binder*, 198 F.3d 177. Petitioner's counsel was not ineffective for failing to raise a meritless objection. *See Greenup*, -- F.3d --, slip op. at 9; *Lilly v. Gillmore*, 988 F.2d 783, 786 (7th Cir. 1993) ("[t]he Sixth Amendment does not require counsel . . . to press meritless issues before a court").

### 3.    Trial counsel failed to object to prosecutorial misconduct

Finally, petitioner contends that his trial counsel was ineffective for failing to object to the instances of prosecutorial misconduct. As discussed above, the alleged instances of prosecutorial misconduct did not deprive petitioner of a fundamentally fair trial. Petitioner was not prejudiced by counsel's failure to raise these objections since they were insubstantial. *Id.* Accordingly, petitioner has not demonstrated ineffective assistance of trial counsel.

### <u>Recommendation</u>

For the above reasons, I respectfully recommend that petitioner's habeas petition be dismissed. Rule 8, Rules Governing § 2254 Cases in the United States District Courts.

Dated:  May 4, 2005                          /s/ Hugh W. Brenneman, Jr.
                                             Hugh W. Brenneman, Jr.
                                             United States Magistrate Judge

28

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within ten (10) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).